1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES  DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHARON GARDNER

                Plaintiff,

      v.

BEAR CREEK CORP., BEAR CREEK
CORP. LONG-TERM DISABILITY PLAN,
and LIFE INSURANCE CO. OF NORTH
AMERICA,

                Defendant.

_____/

No. C 06-02822 MHP

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON THE
ADMINISTRATIVE RECORD**

      Plaintiff Sharon Gardner ("Gardner"), a fifty-seven year old woman, brings this action under 29 U.S.C. section 1132(a)(1)(B) seeking benefits under the Group Long Term Disability Policy ("Policy"), which was issued by Life Insurance Company of North America ("LINA") to the Bear Creek Corporation.  The Policy provides disability insurance coverage to the Bear Creek Employee Benefit Plan ("Plan").  Gardner also brings a claim for relief under 29 U.S.C. section 1132(a)(3) against LINA for a breach of fiduciary duties.  Now before the court are the parties' cross-motions for judgment by the Court, under Federal Rule of Civil Procedure 52, based on the Court's de novo review of the Administrative Record.  The court, having read and considered the documentary evidence and the written submissions of the parties, now makes the following Findings of Fact and Conclusions of Law.

I.      FINDINGS OF FACT[1]

1. Gardner began working for the Bear Creek Corp., the parent company of Harry & David in 1996 as an advertising and promotions coordinator.  AR 923.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    2. At all relevant times, Gardner was insured under a group long-term disability insurance policy

2    ("the Policy") issued by defendant LINA to Bear Creek.

3

4    3. The relevant portions of the Policy are as follows:

5    DISABILITY. An Employee will be considered Disabled if because of Injury or Sickness:
     1. he is unable to perform all the material duties of his regular occupation; and after Monthly
6    Benefits have been payable for 36 months, he is unable to perform all the material duties of any
     occupation for which he is or may reasonably become qualified based on his education, training
7    or experience.

8    RESIDUAL DISABILITY. An Employee will be considered Residually Disabled if, while he
     is Disabled, he returns to work for wage or profit.
9
     COMMENCEMENT OF BENEFITS.
10   The Insurance Company will begin paying Monthly Benefits in amounts determined from the
     Schedule when it receives due proof that:
11           (1) the Employee became Disabled while insured for this Long Term Disability
     Insurance; and
12           (2) his Disability has continued for a period longer than the Benefit Waiting Period has
     shown in the Schedule.
13
     PROOF OF LOSS.
14   Upon request, written proof of continued Disability and of regular attendance of a physician
     must be given to the Insurance Company within 30 days of such request.
15
     AR 474, 483, 495.
16

17   4. In October 1999 Gardner tested positive for carpal tunnel syndrome.  AR 800, 863.

18

19   5.  At that time, Gardner filed a Workers Compensation claim, which was settled on September 5,

20   2001 for $15,375.00.  AR 840, 907, 922.

21

22   6.  In February 2000 Gardner underwent a bilateral carpal tunnel release surgery, which improved

23   her condition.  AR 800, 863

24

25   7.  Following the surgery, Gardner returned to work on a part-time basis around June 2000.  AR 863.

26

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

2

UNITED STATES DISTRICT COURT
For the Northern District of California

8.  In February 2001, Gardner underwent a left endoscopic carpal tunnel release surgery.  AR 232.
In March 2001, she had a another surgery, a right endothoscopic carpal tunnel release.  AR 232.
This surgery reduced her pain and tingling by approximately 50%.  AR 232–33.

9. On August 9, 2001 Dr. Scott Young, Gardner's hand/wrist surgeon, diagnosed her with median,
radial and ulnar neuritis in both forearms, myofascial pain in both forearms, flexor tendinitis,
bilateral thoracic outlet syndrome, and double crush syndrome.  AR 204.  At that time, Gardner's
computer use was 2–3 hours day, which is longer than he recommended.  He noted that she did not
use a computer at home but sometimes taught a computer class six hours a week.  AR 203.  Dr.
Young concluded that because she had been overworking her hands, she should be restricted from
using the computer and from doing any repetitive work with her hands.  AR 204.

10.  In August 2001 Gardner made a claim for disability benefits due to carpal tunnel syndrome,
epicondylitis, cervical joint impingement, excessive pain, weakness, and numbness in her hands and
arms.  AR 922.

11. Gardner left work on disability.  Her last day of work was on August 28, 2001.  AR 923.  After
her disability prevented her from continuing as a graphic designer, she wanted to become a
supervisor, but her employer would not accommodate her and terminated her employment.  AR 909.

12.  At the time of her disability claim, her salary was $3,458 per month.  AR 923.

13.  Dr. Young's diagnosis stayed substantially the same on August 30, 2001.  AR 205.  On
September 27, 2001 Dr. Young noted that she had mild residual carpal tunnel syndrome; her right
radial nerve was moderately compressed; her left radial nerve was mildly compressed, but much
improved since her operations; and she still had numbness in her right hand  Dr. Young found that
she still had radial nerve compression in her right arm.  AR 206.  On January 3, 2002 Dr. Young

3

found positive Tinel's sign on the right elbow and residual carpal tunnel.  He found her grip to be weaker than her extension, although he noted it was "up a little."  Overall, Dr. Young described Gardner as weaker than he expected.  AR 214.  Dr. Young stated in a November 2001 chart note that Gardner, as a result of her disability, was "currently supervising" at Bear Creek.  AR 863.

14.  Dr. Young ordered a bilateral nerve test on both Gardner's left and right sides.  AR 217.  His January 24, 2002 report indicated her ulnar nerves bilaterally were clear on both sides.  A Magnetic Resonance Imaging test (MRI) showed Gardner had a "bit of a neck problem," and Dr. Young focused on the neck "as the main remaining place she is getting symptoms from."  AR 218.

15.  As of February 15, 2002, Dr. Young noted that Gardner was able to walk, sit, or stand with "no problem."  Repetitive use of her hands was very limited for any length of time, and she could not lift, carry or handle objects very well.  She also could not drive too long without problems in her hands.  Dr. Young stated that this was a permanent restriction.  Dr. Young noted her mental activities were normal.  AR 219.  On March 7, 2002 Dr. Young repeated his findings that she "cannot do repetitive work."  He further found that she still has pain in her hands, neck and arms, and her carpal tunnel was still sore, but he expressed hope that it would improve.  He concluded that she can work, but only if she does not use her upper extremities.  According to Dr. Young, this means she can do "head or mind work, but not hand work."  AR 816.

16.  LINA began paying disability benefits to Gardner on February 25, 2002.  The benefits were paid on a monthly basis minus certain offsets as proscribed by the Policy.  AR 114.

17.  Gardner received a salary continuation benefit from Bear Creek through February 28, 2002.  AR. 923.

18. On April 12, 2002 LINA's Case Manager Brent Vahle recorded that, based on Dr. Young's

4

UNITED STATES DISTRICT COURT
For the Northern District of California

diagnosis, Gardner could not return to her job because her limitations prevented her from frequent computer use. AR 462. A preliminary Transferable Skills Analysis found that Gardner—based on her medical limitations, her work history, "wage," and education—had no transferable skills. AR 462.

19. On April 16, 2002, Gardner reported to a vocational rehabilitation consultant that she was interested in teaching and that she believes she can teach without using her upper extremities. AR 781, 834. Gardner had previously obtained a provisional teaching credential and had taught high school and one semester of college. AR 781, 834. The consultant noted that Gardner would need to get certification to continue teaching, and would need "2 years of study to get [a] degree to teach high school or junior college." AR 781. In a 2002 disability questionnaire, Gardner also stated that she considered becoming a consultant. AR 834.

20. On September 13, 2002, Gardner reported to LINA that she cooked less than an hour a day, 3–4 times a week. AR 759. She reported that she cleaned 2–3 times a month; shopped "monthly"; read 3–5 days per week, about an hour a day; and took walks to relieve her pain and improve her mental outlook. AR 759. She also reported that she used a computer 3–4 times a week to check her e-mail. AR 759. She further reported that she was unable to use buttons or zippers, that she had difficulty sleeping, that she did not feel alert or capable of maintaining scheduled hours, and that she suffered pain in her upper extremities with "most repetitive movement," which included writing. AR 759.

21. In September 2002, Gardner had a left radial tunnel release surgery. In February 2003, she had a right radial tunnel release. AR 233. These surgeries decreased her pain by about 50% and decreased her right thumb stiffness and thumb based pain. AR 233.

22. On April 10, 2003 Gardner told a vocational consultant she was taking classes on life coaching, spoke of her marketing experience, and claimed she was pursuing self-employment, which would

UNITED STATES DISTRICT COURT
For the Northern District of California

1  involve working over the phone.  AR 740.  Gardner again stated that she had physical pain in her

2  neck and was suffering from poor sleep.  AR 740.

3

4  23. On July 31, 2003 Gardner returned to see her family physician, Dr. Howard Morningstar.  He

5  found reoccurring Bilateral Carpal Tunnel Syndrome with both her right and left hands testing

6  positive using the Tinel's and Phalen's tests.  Dr. Morningstar found that Gardner's grip strength

7  was reduced approximately 20% in the right hand and 50% in the left hand.  He noted that she will

8  "need either to stop or greatly modify her work as the problem is recurrent, likely to be progressive

9  and permanently disabling."  AR 221.  Dr. Morningstar's August 5, 2002 Attending Physician

10  Statement (APS) stated at the time of her visit that she was  "unable to do regular work."  On his

11  APS, Dr. Morningstar checked a box indicating her condition had retrogressed and checked a box

12  indicating that her limitation involved the use of her hands (leaving unmarked any limitation on

13  standing, walking, climbing, lifting, sitting, bending, or psychological impacts).  AR 222.  Dr.

14  Morningstar listed Gardner's physical impairment as Class 4, meaning she had a "moderate

15  limitation of functional capacity; capable of clerical/administrative ('sedentary') activity."  AR 223.

16  Dr. Morningstar stated that she "may not use her hands repetitively."  AR 223.   Finally, he indicated

17  that she had no mental limitations.  AR 223.

18

19  24. In a letter dated February 15, 2004 LINA requested that Gardner provide the identity of her

20  treating physician and an assessment of her current status.  AR 570.

21

22  25. LINA sent a second letter on February 24, 2005 requesting similar information.  AR 568, 574.

23

24  26. On March 1, 2004 Gardner reported to LINA that her arms, neck and hands were in "constant

25  pain," that she suffered from poor sleep, and she is unfocused and irritable all day.  AR 698.  She

26  stated that bilateral carpal tunnel syndrome, lateral nerve compaction, and cervical joint compaction

27  prevented her from working.  AR 698.  Functionally, she stated that she could drive "1-2 hours

28

UNITED STATES DISTRICT COURT
For the Northern District of California

comfortably" and use the computer "10-15 mins /am & p.m."  AR 698.  Gardner reported that she was able to cook thirty minutes a day, seven days a week; clean her house ten minutes a day, twice a week; shop thirty minutes a day, twice a week; do her laundry twice a month; and read 20-30 minutes a day, seven days a week.  AR 698.

27. On March 5, 2004 Dr. Morningstar found that Gardner's grip strength was reduced two-thirds bilaterally, her finger joints were tender but not swollen, and Tinel's and Phanel's tests were strongly positive bilaterally.  Her shoulders, neck and elbows appeared normal.  Gardner told Dr. Morningstar that she has difficulty gripping a phone or doing any focused work with her hands.  He referred her to a hand specialist or occupational therapist, and stated he was "willing to affirm that [Gardner] is significantly and chronically disabled because of this problem and is unable to do any work that involves repetitive use of her hands."  AR 225–26.

28. On November 8, 2004 Gardner again reports to LINA.  She again stated that she suffers from poor sleep and pain when using her hands.  AR 610.  She further states that sitting "hurts for any length of time" and that she "can't hold [a] phone."  AR 610.  She uses door levers instead of door knobs and uses ergonomic utensils.  AR 610.  She stated that she is knowledgeable about her computer, but cannot bear the pain of using the mouse or the keyboard.  AR 610.  She uses the computer infrequently, to check and pay bills and access her e-mail.  AR 610.  At the time, she cooked 2–3 times a week, irregularly; cleaned 30 minutes a day, 1–2 times a week; shopped an hour a day, twice a week; did her laundry twice a week; read 1–1.5 hours a day, two to three times a week; attended school 1.5 hours a day, twice a week, and went to religious services two hours a day, once a week.  AR at 610.  She could also drive for up to 10–15 minutes.  AR 610.

29. Gardner saw Dr. Morningstar again on November 12, 2004.  Dr. Morningstar found bilateral positive Tinel's and Phalen's signs, tenderness and stiffness in all the small joints of her fingers on both hands, and greatly reduced grip strength.  He reported that Gardner's shoulders and elbows

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   were normal.  Dr. Morningstar instructed her to avoid any repetitive use of her hands and stated that

2   she "continues to be disabled, as she is a graphic designer and is unable to use her hands for any

3   meaningful work."  AR 226.  He noted that she was attending school.  AR 226.  Dr. Morningstar's

4   attached Physical Ability Assessment stated that Gardner can sit "frequently" (between 2.5-5.5

5   hours in an 8 hour work day); she can do simple grasps "occasionally" (less than 2.5 hours); she had

6   no ability to reach, grasp firmly, carry, or push objects and she had no restrictions on standing or

7   walking.  The PAA also noted that she can also climb regular stairs "frequently" (2.5-5.5 hours).  In

8   the APS, Dr. Morningstar again states that "she is unable to use [her] hands for any repetitive tasks."

9   AR 229–30.

10

11   30. Gardner undertook a work capacity evaluation, which was completed on January 21, 2005 ("Ey

12   report").  AR at 292.  The evaluators depended on Dr. Morningstar's November 12, 2004 Physical

13   Ability Assessment to determine Gardner's functional ability.  AR 292.  To determine Gardner's

14   transferable skills, the evaluators relied upon the aforementioned preliminary Transferable Skills

15   Analysis which, based on Gardner's disability, work history, and education, found that Gardner had

16   no viable occupational options based on her skill set.  AR 292–93, 462.  The Ey report concluded

17   that Gardner has "no work capacity" and "there is no work capacity upon which to base a vocational

18   rehabilitation plan at this time."  AR 293.  LINA objects to the evaluation's conclusion, arguing that

19   it failed to take into account Gardner's education, supervising  experience and teaching

20   qualifications in determining whether she can work "any occupation."

21

22   31.  Gardner began seeing hand surgeon Dr. David Nelson, M.D.  She saw him for the first time on

23   March 15, 2005.  AR 232.  Before examining her, Dr. Nelson noted that patients with Gardner's

24   height, weight, bust size, stooped shoulder posture, multiple nerve compression problems, and

25   complaints of pain "quite classically have thoracic outlet syndrome."  AR 234.  Dr. Nelson pressed

26   below her clavicle on both sides as part of his examination.  Based on Gardner's response, Dr.

27   Nelson opined that she had classic symptoms of TOS down her left arm.  AR 234.  He noted that

28

1   she has more symptoms on her left side than her right side.  AR 234–35.  Gardner also told Dr.

2   Nelson that sitting in a military posture helped to alleviate her symptoms, which Dr. Nelson noted is

3   a classic response from people suffering with TOS.  AR 235.  Based on his findings, Dr. Nelson

4   stated she "certainly" has TOS.  AR 235.

5

6   32. In the same report, Dr. Nelson recommended that Gardner start a program called the Edgelow

7   technique, which had helped his patients in the past.  AR 235.  He believed that her "maximum level

8   of ability at this time is less than sedentary" and at that time she could not work as a graphic

9   designer.  AR 235.  He noted that with 3–4  months of the Edgelow technique, she would "probably

10   have a marked decrease in her symptoms."  After 3–4 months, he hoped she could return to "some

11   kind of work" as a graphic designer although it "may have to be modified."  AR 235.  Dr. Nelson

12   believed Gardner should be able to do sedentary work, with modification, after she completes the

13   Edgelow technique.  AR 236.  In regard to her physical limitations, Dr. Nelson found that Gardner

14   had a very limited ability to grasp, do fine manipulation, sit at a keyboard or type.  She could reach

15   or sit for up to 2.5 hours.  According to Dr. Nelson, Gardner's walking, standing, balancing,

16   kneeling, crouching, and climbing were without limitation.  AR 235.

17

18   33. Dr. Nelson's APS reaffirmed that Gardner could not do "even limited sedentary work," although

19   he believed she should be able to work in the future with some months of the Edgelow physical

20   therapy.  AR 241.  He noted dysesthesia down her left arm, which is consistent with multiple failed

21   decompressive surgeries.  AR 238.  Her subjective symptoms included tingling and aching in her

22   arms, with her left hurting more than her right.  AR 238.  Dr. Nelson found these symptoms to be

23   consistent with her clinical evaluations.  AR 238.  According to the report, Gardner's ability to

24   reach, do simple grasping, firm grasping, fine manipulation, lift objects, and carry objects was

25   completely restricted.  AR 240–41.  He found that Gardner could stand and walk "continuously"

26   (5.5+ hours) and sit "occasionally" (less than 2.5 hours).  AR 240.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

34. On March 15, 2005 LINA advised Gardner that no further benefits were payable because she had provided inadequate proof of disability. AR 564–66 .

35. Gardner was diagnosed by Dr. Richard Mendius, M.D.-Neurology, on March 23, 2005. He diagnosed her with Thoracic Outlet Syndrome, noted profound weakness in her biceps and triceps, diagnosed dynsethesia on her left arm, and performed a positive Adson's test in her left arm. AR 247. According to Dr. Mendius' Physical Ability Assessment, Gardner had a "100 % disability" and her "disability [is] permanent." AR 247–49.

36. On March 25, 2005, Gardner sent a response to LINA's March 15, 2005 letter. AR 550–51. Gardner requested that LINA re-open her claim. AR 550. Gardner provided LINA with completed APS forms from Dr. Nelson and Dr. Mendius. AR 551. In early April, LINA notified Gardner that they would pay her benefits under a "reservation of rights" until it completed a review of her medical records. AR 534. LINA notified Gardner that she was being scheduled for an Independent Medical Evaluation. AR 534.

37. On April 5, 2005 Dr. Robert Manolakas, LINA's Associate Medical Director, conducted a phone interview with Dr. Nelson. AR 539. Dr. Manolakas claims that Dr. Nelson was unable to explain the basis for the sitting restriction he noted on March 15, 2005. In his interview with Dr. Manolakas, Dr. Nelson stated he is unaware of any EMG/NCS studies confirming his analysis and believes Gardner has TOS primarily due to the pain response test he conducted by pressing on her clavicles. AR 539. Dr. Nelson told Dr. Manolaka that he could not provide positive clinical findings, such as muscular atrophy, edema, specific sensory loss, lost reflexes, or neuromuscular weakness. AR 49, 539. Dr. Manolakas reported that Dr. Nelson believed Gardner could likely return to clerical work in about four months. AR 48.

38. Also on April 5, 2005, on behalf of LINA, Dr. Robert Manolakas reviewed the medical

10

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    evidence in Gardner's file.  AR 48.  He found there was "insufficient medical documentation" to

2    support a determination as to Gardner's physical restrictions.  AR 48.

3

4    39.  In the same report, Dr. Manolakas listed what he believed was the evidence which undermined

5    Gardner' disability claim, including 1) the lack of documentation regarding specific loss of

6    sensation, reflexes, or neuromuscular atrophy; 2) no positive NCS/EMG studies; 3) no specific

7    tenderness, swelling, temperature or dystrophic changes; 4) no positive labs for inflammatory

8    disease and no imaging studies; 5) the fact that Gardner attends school, goes on walks for "three

9    hours," shops and does yoga, which denotes a "high level of function"; 6) and the fact that the weak

10   analgesia she is taking is "not characteristic of incapacitating pain."  AR 48.  In support of Gardner's

11   debilitation, Dr, Manolakas noted her history of surgeries and the corroboration of her symptoms by

12   her "treating and consulting physician."  AR 48.

13

14   40. From May 12–15, 2005 surveillance agents from Photofax, Inc. covertly monitored Gardner at

15   her home on LINA's behalf.  Gardner never left her home throughout the surveillance.  AR 426.  At

16   7:21 a.m, 7:48 a.m., and 8:37 a.m. on May 12, a surveillance agent conducted a walk-by and

17   observed what he believed to be Gardner using her computer while wearing headphones.  AR 428.

18   At 7:16 am and 9:57 am on May 13, a surveillance agent conducted a "discrete wall-by" and again

19   observed what appeared to be Gardner using her computer, without any mention of Gardner wearing

20   headphones.  AR 430.  After conducting a background check, the surveillance agents stated that

21   Gardner was "allegedly a full-time student" taking 16 credit hours at California Institute of Integral

22   Studies in San Francisco, was the author of two books and worked as a counselor for the dying.  AR

23   440–41; 435.  Further, the agents reported that Gardner had previously run her own businesses,

24   named "Abundance by Design" and "Dovetail Coalition."  AR 436.  The surveillance agents

25   admitted that "Abundance by Design" was inactive and that Gardner had not been involved with

26   Dovetail Coalition for "the past couple years."  AR 436.  The surveillance agents also located

27   Gardner's online biography, which spoke of her publication history and her thirty-year involvement

28

11

in small business development.  AR 440.  The surveillance agents listed Gardner's occupation as "author, muse, psychology student."  AR 435.

41.  On June 17, 2005 LINA advised Gardner that it had reviewed the additional evidence submitted, that the evidence did not establish her disability and that LINA would terminate her benefits.  AR 372.

42. LINA terminated benefits on June 17, 2005, based again on its determination that the medical evidence did not support the existence of a disability under the "any occupation" definition of disability under the Policy.  AR 114.

43. On August 17, 2005 Gardner sent LINA a letter containing her objections to the surveillance report's conclusions.  She claims the computer is not a "full, productive" computer but is used "solely for the purpose of storing music and voice memos."  AR 350.  She claims that the surveillance agents witnessed her listening to music on her computer or talking on the phone.  She claims that she uses music and recordings for pain management, enjoyment, and to prepare for classes, as she claims she cannot manually take notes.  AR 302, 350.  Gardner further objects to the agents' characterization of her educational record, claiming she was not a full-time student, but instead took two classes, none of which were for credit.  AR 351.  She admits that in 2004 she investigated how to obtain a graduate degree in psychology to become a psychological counselor, but was deterred when she learned it would take six years and her work experience would not transfer as college credit.  AR 352.  She further claims she was never a counselor for the dying.  AR 352.  She believes the agents' information source as to her job as a counselor may have been confused and given the agents false information about dying patients in reference to Gardner's desire to join a "Threshold Choir," a group that sings to the dying.  AR 352–53.  Gardner states that has never been a member of this group due to her own disability, conflicts with their practice schedules and the amount of driving that would be involved.  AR 353.  In a separate declaration, she states, "I

UNITED STATES DISTRICT COURT
For the Northern District of California

have never worked for money to counsel people, or obtained referrals from hospitals." AR 303.  In her declaration she also claims that the books the investigators found were authored by a team of writers between 2000-2001, and, since then, she has not authored any other books.  AR 303.  In regard to her small-businesses, she claims that she sold "Abundance by Design" in 2001 and that it was never operated as a business.  AR 303.  She further claims that "Dovetail Coalition" was a political non-profit group with which she has had no connections for approximately four years.  AR 303.  Finally, in the August 2005 letter, Gardner claims the online biography was written by the company that purchased her manuscripts, that it was written in September 2001 and that it "reflect[ed] their style of marketing promotion to emphasize and exaggerate certain facts for marketing purposes."  AR 352.  Gardner claims she did not correct discrepancies in the biography "due to the unique marketing nature of this website."  AR 352.

44.  On May 20, 2005 Gardner met with LINA's Independent Medical Examiner, Dr. Michael M. Bronshvag.  AR 171.  On May 23, 2005 Dr. Bronshvag issued his report.   His physical examination found no edema, dyspnea, or cyanosis.  AR 175.  Dr. Bronshvag conducted a thoracic outlet maneuver (in which patient's arms are abducted and externally rotated), which he found did not demonstrate a clear-cut pulse deficit.  He did note that Gardner suffered more discomfort on her left side than her right.  AR 176.  He conducted a needle EMG sampling on Gardner's left arm muscles (including her deltoid, triceps, biceps, flexor carpal ulnarls, flexor carpal radialis, and brachloradialls), which revealed everything to be "normal."  AR 177.  He believed her appropriate diagnosis is musculoskeletal strain syndrome with more prominent symptoms on the left.  AR 177.  He could not fine "gross evidence" of neurovascular compromise (such as TOS).  AR 178.  His conclusion states:

> patients who are substantively overweight with posture-habitus configurations similar to those of this patent [sic] have neck and arm radicular symptoms, which do respond to the types of treatment advised by Dr. Nelson and performed by Mr. Edgelow. Whether one wishes to call that situation postural strain with thoracic outlet syndrome or cervical-brachial syndrome or something else is a semantic question.

AR 178.

13

1    In the same report, Dr. Bronshvag stated that Gardner has "some modest difficulties" but no

2    substantive "derangement."  AR 179.  Dr. Bronshvag  believes Gardner "is clearly able to perform

3    full-time work, but does have some definite (modest) limitations."  AR 178.  Dr. Bronshvag's

4    Physical Ability Assessment (issued alongside his May 20 report) stated that Gardner can do simple

5    grasping with both hands "continuously" (5.5+ hrs) and can sit, stand, walk, do fine manipulation

6    with both hands, and grasp firmly with both hands "frequently" (2.5-5.5 hours).  AR 181–82.

7

8    45. Gardner appealed LINA's termination of disability benefits, which was subsequently denied on

9    April 12, 2006.  AR 119.

10

11   46. Gardner objected to Dr. Bronshvag's professionalism and medical conclusions.  In her

12   declaration, Gardner alleges that Dr. Bronshvag's exam was inadequate, in that it consisted only of a

13   15 minute face-to-face exam.  This included a 5 minute physical exam, which consisted of Dr.

14   Bronshvag looking into her eyes, having her open her mouth, and testing her elbow's reflexes with a

15   mallet.  AR 301.  Gardner alleges that Dr. Bronshvag forgot her name several times, did not examine

16   her arms and shoulders, never touched her clavicle to test for swelling and never tested her right

17   arm.  AR 301.  Gardner states that Dr. Bronshvag never contacted Dr. Handlund who would have

18   had the most information about her diagnosis and physical conditions, including her difficulties

19   sleeping, which she believes plays a major role in her disability.[2]  AR at 307.  Gardner objects to Dr.

20   Bronshvag's conclusions regarding her ability to work, claiming he never did any test to determine

21   whether she could manage frequent continuous repetitive hand manipulations.  AR at 308.  Gardner

22   characterizes the exam as "very unprofessional."  AR 301

23

24   47. On July 28, 2005 Dr. Nelson wrote a report to Dr. Young regarding Gardner's condition.  AR

25   243.  He repeated his reasons for believing Gardner has TOS, including her response to his pressure

26   test, her response to sitting in a military posture, her past surgeries, and her body type.  AR 243.  Dr.

27   Nelson noted that Gardner was complaining of a lack of grip strength, difficulty sleeping, and

28

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1    tingling and numbness in her arms.  AR 243.  He objected to the idea of an MRI, because MRIs can

2    support a diagnosis of TOS if there is a "clear mechanical obstruction," but they are "of limited

3    usefulness if the problem is a postural one."  AR 243

4

5    48. Dr. Nelson's letter criticized Dr. Bronshvag's method of determining whether Gardner has TOS.

6    Dr. Nelson believes Dr. Bronshvag's test—i.e. testing for TOS by looking for a change in pulse with

7    Gardner's arms abducted and externally rotated—was ill-considered.  AR 244.  According to Dr.

8    Nelson, this test would be proper if Gardner has vascular TOS, but since Gardner was diagnosed

9    with neurological TOS, this test could not be expected to be positive.  AR 244.  Dr. Nelson

10   interpreted Dr, Bronshvag's diagnosis as supporting a finding of TOS.  AR 244.  Dr. Nelson offered

11   a five pronged recommendation: 1) Gardner should continue seeing Dr. Hadland; 2) she should start

12   the Edgelow Technique; 3) she needs to lose weight, because her weight "is now a medical problem

13   for her"; and 4) she needs psychological counseling.  The fifth recommendation reads:

14               I think she needs to return to some kind of work.  I realize that she can't
             do her normal job.  However, if she could self pace herself, such as doing
15           freelance work, she would have more income, a better sense of self
             respect, and a feeling of accomplishment, all of which will help alleviate
16           her depression and . . . help decrease the response that she has from her
             symptoms due to TOS.
17   AR 244–45.

18

19   49.  On August 14, 2005 Dr. Steven Hadland, who specializes in pain management, completed an

20   Attending Physician Statement.[3]  Dr. Hadland had been seeing Gardner every two weeks since April

21   2005 for her pain problem associated with her TOS symptoms.  AR 341.  He first saw her on March

22   16, 2005.  AR 252.  Dr. Hadland reported that, based on EMG, MRI, and physical examination,

23   Gardner's symptoms were "quite severe," she was "100% disabled," and it will be "many months,"

24   if not 1–2 years, before she could consider "work of any kind," which includes graphic design or

25   "some other field for which she may need training."  AR 341.  He diagnosed her with myofascial

26   pain syndrome, AR 342, and lists her as "currently totally disabled."  AR 343.  According to Dr.

27   Hadland, Gardner can walk, sit and stand up to 2.5 hours.  AR 343 (the Physical Ability Assessment

28

15

stated that she could sit up to one hour, stand up to 1 hour, and walk up to 2 hourss. AR 344).  He further reported that Gardner's reaching, fine manipulation, simple and firm grasping were severely restricted.  AR 344.

50.  On November 23, 2005 Dr. Hadland reported that he has met Gardner for seventeen ninety minute sessions. AR 254.  He noted that he first focused on helping her overcome her sleep deprivation, and, due to his suggestions, she is now able to get eight hours of sleep. AR 253.  This lessened her chronic fatigue. AR 253.  In regard to her physical disability, Dr. Hadland believes Gardner suffers from "nerve impingement likely in the area of the thoracic outlet." AR at 252.  He has been able to reduce the pain in her right arm about 90%, and the left arm up to 60%.  AR 253–54.  He believes that her pain will return in the right arm with over-use, and she will always be vulnerable to re-injury if she is subject to the stressors that first contributed to her original condition. AR 254.  He suspects there "will be limits on how much she can use her hands and arms for the foreseeable future." AR 254.

51.  Gardner was referred to Dr. Tracy Newkirk, M.D.-Neurology, for treatment of her TOS.  Dr. Newkirk's August 31, 2005 analysis found severe bilateral edema at the clavicles; abnormal draining of dorsal hand veins and a neurotension sign that is positively bilateral.  Dr. Newkirk noted that the previous open MRI did not prove TOS, but he claims that "open studies cannot prove this diagnosis." AR 256.  He diagnosed Gardner with "Writer's Cramp, Costoclavicular Syndrome, post-Traumatic Migraine, Cervical Strain, and Low Back Pain/Syndrome, also due to [TOS]." AR 256.  Dr. Newkirk labeled Gardner's disability as "permanent." AR 258.  He instructed Gardner to get an MRI/MRA/MRV.  On October 6, 2005, Dr. Newkirk again noted Gardner's severe edema, alongside swollen hands, tenderness in the clavicles, and positive upper limb neurotension. AR 260.  On December 12, 2005, after an MRI/MRA/MRV was taken, Dr. Newkirk concluded that the MRI/MRA/MRV tested positive for "mild to moderate hypertrophy anterior scalenes right, mild to moderate extrinsic compression of bilateral subclavian veins on hyperabduction." AR 261.  Again

16

1   Dr. Newkirk noted Gardner's severe edema and tender clavicles.  AR 261.

2

3   52.  On January 23, 2006 Gardner went to Mills-Peninsula Health Services for a Functional Capacity

4   Evaluation ("Aanenson report"). The Aanenson report found that Gardner "performed with full

5   effort with less-than-full effort being documented only on consistency testing of pinch grip."  AR

6   282.  The report concluded that Gardner performed "below sedentary level of work during the

7   evaluation.  She could not consistently function at the sedentary level on a full-time basis at this

8   time."  AR 282.  The report, upon Gardner's request to determine her capacity to compete in an open

9   labor market, concluded that she could not compete in the labor market for full-time employment

10  and she could tolerate up to 2–3 hours of activity involving her upper extremities.  AR 282.  Like the

11  Ey report, LINA objects to this report's conclusion, arguing that it failed to take into account

12  Gardner's education, supervising experience, and teaching qualifications in determining whether she

13  can work "any occupation."  LINA also claims this evaluation is of little probative value because it

14  was based solely on Gardner's subjective responses.

15

16  53. According to the Aanenson report, Gardner's grip strength was at or below the second percentile

17  with an average of 32 lbs right and 21 lbs left.  Her reaching and functional hand activities were

18  limited to 16 minutes at a time maximum, decreasing with repetition down to 4 minutes.  Her daily

19  total tolerance was 60 minutes. AR 282.  According to the report, Gardner could be functionally

20  active for 2–3 hours before a several hour break is required due to limitations in her upper

21  extremities.  AR 282.  Gardner can sit and stand 3 hours intermittently throughout an 8 hour day, 30

22  minutes at a time; and she can walk one hour with her arms supported, 3 hours intermittently

23  throughout the day.  She can alternatively sit/stand/walk for 2–3 hours at a time, 4–6 hours

24  throughout the work day.  AR 284.  The report concluded that Gardner's Rating of Perceived

25  Capacity was below the Department of Labor's sedentary range of physical demand characteristics.

26  She also performed below the sedentary level during the evaluation.  She was not yet able to

27  complete the test to determine her DOL work capacity category.   AR 286. The musculoskeletal

28

UNITED STATES DISTRICT COURT
For the Northern District of California

17

UNITED STATES DISTRICT COURT
For the Northern District of California

1   evaluation noted clinical findings consistent with TOS, such as a positive Adson's test and

2   tenderness to palpitation on her left and right clavicles.  AR 286–87

3

4   54.  On March 6, 2006 Dr. Newkirk delivered another report.  He described the basic theory of

5   Gardners' disability as "arm positions that are needed to do useful work are responsible for

6   compressing the blood vessels, nerves and lymphatics vital to the use of both arms thus effectively

7   disabling them for all work-related tasks."  AR 132.  He disagreed strongly with Dr. Bronshvag's

8   conclusions, stating "he fails to take into account that electrodiagnostic studies are normal or near-

9   normal in this syndrome nearly all of the time . . . [he] does not understand the etiology of this

10  patient's syndrome."  AR 134.  Dr. Newkirk claimed that Dr. Bronshvag erroneously believes

11  Gardners' disability is rooted in her obesity.  AR 139.  Dr. Newkirk further claimed that Dr.

12  Bronshvag's finding that Gardner has only a minor preclusion in regards to her reaching is "totally

13  refuted" by the MRI/MRA/MRV, which "shows conclusively that upon reaching she experiences

14  marked compression of the venous return from the arms for the duration of the reaching."  This

15  "severe interferences with blood flow defeats the activity."  AR 139.  Dr. Newkirk further claims

16  that Dr. Bronshvag failed to define the type of TOS at issue, which led to his misdiagnosis.  AR 140.

17

18  55.  In the same evaluation, Dr. Newkirk provided a functional diagnosis stating that Gardner's

19  sitting tolerance is limited to thirty minutes consecutively and no more than 2 hours a day; that she

20  can stand still for thirty minutes consecutively; and that she has no restrictions on walking.  The

21  evaluation stated that Gardner's typing or fine hand motor activities was limited to no more than five

22  consecutive minutes and limited to no than an hour a day.  According to Dr. Newkirk, Gardner is

23  precluded from any work at or above shoulder level and precluded from "any sustained activity in

24  front of the body with either or both arms."  AR 140–141.  Dr. Newkirk concludes that Gardner is

25  "currently disabled from any gainful employment since the time [her original employment] ceased . .

26  . ." AR 142.

27

28

18

UNITED STATES DISTRICT COURT
For the Northern District of California

1    56. On April 11, 2006 Dr. R. Norton Hall, LINA's Associate Medical Director, reviewed Gardner's

2    file.  AR 123.  After a review of Gardner's medical records, Dr. Hall concluded that "medical data

3    fails to support the limitations imposed and negates a status of no work. [Gardner's] self-reported

4    daily activities [contained in her 2002, 2004, and 2005 self-reports] indicate a functionality that

5    negates a status of no work."  AR 123.

7    57.  Thereafter, Gardner filed this action under ERISA, 29 U.S.C. § 1132(a)(1)(B), for breach of the

8    Policy, seeking to recover disability benefits as well as breach of fiduciary duties.

10   II.    CONCLUSIONS OF LAW

11   1. ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary.

12   See 29 U.S.C. § 1132(a)(1)(B).

14   2. ERISA creates federal court jurisdiction to hear such a claim.  See 29 U.S.C. § 1132(e).

16   3. ERISA benefits determinations are to be reviewed de novo, "unless the benefit plan gives the

17   administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe

18   the terms of the plan."  Firestone v. Burch, 489 U.S. 101, 115 (1989).  An administrator has

19   discretion only where it is "unambiguously retained."  Kearney v. Stanford Ins. Co., 175 F.3d 1084,

20   1090 (9th Cir. 1999) (quoting Bogue v. Ampex Corp., 976 F.2d 1319, 1325 (9th Cir. 1992)).

22   4. The parties agree that the Policy contains no such language and thus LINA's denial is to be

23   reviewed de novo.

25   5. In a de novo review, determining whether plaintiff is entitled to disability benefits requires the

26   court to interpret the plan by looking "first to the terms of the plan itself."  Nelson v. EG & G

27   Energy Measurements Group, Inc., 37 F.3d 1384, 1389 (9th Cir. 1994).

28

6. "When faced with questions of insurance policy interpretation under ERISA, federal courts should apply federal common law." Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th Cir. 2002) (citing Firestone, 489 U.S. at 110).

7. Under federal law, courts should then interpret plan terms "in an ordinary and popular sense as would a [person] of average intelligence and experience." Allstate Ins. Co. v. Ellison, 757 F.2d 1042, 1044 (9th Cir. 1985).

8. After review of the administrative record, including all of plaintiff's relevant medical history, the court concludes that plaintiff was and remains unable to perform all the material duties of her regular occupation on a full-time basis.

9. Because Gardner received benefits for more than 36 months, her entitlement to benefits is evaluated under the "any occupation standard" of the Policy. AR 474.

10. "The language of the 'any occupation' standard is not demanding . . . it requires only that [plaintiff] be able to perform a job for which he is qualified or for which he can reasonably become qualified by training, education or experience." McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310, 1317 (9th Cir. 1994). "Under [the any occupation] standard, an employee must be incapable of performing any occupation in order to be totally disabled." Id. at 1313. See also Brigham v. Sun Life of Can., 317 F.3d 72, 86 (1st. Cir. 2003) (stressing the difficulty of meeting the any occupation standard in finding a paraplegic not totally disabled under the any occupation standard).

11. Plaintiff must prove, by a preponderance of evidence, that she is disabled under the any occupation standard. See Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998); Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) (Wilken, J.)

20

12.  Plaintiff must be precluded from completing all material duties of any occupation to satisfy the any occupation standard.  Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 459 (9th Cir. 1996).

13. Gardner argues that Ninth Circuit case law requires interpretation of "all material duties" against the insurer because it is ambiguous.  See McClure v. Life Ins. Co. of N. Am., 84 f.3d 1129, 1134 (9th Cir. 1996).  Gardner thus argues that she has met her burden if she can prove that she cannot complete any material duty of any occupation.  However, the ambiguous insurance policy language in McClure focused upon the meaning of "every duty," which could mean "all" (as in the entirety) or "each" (as in the separate parts of the entirety).  Id.  In interpreting the language against the insurer, the court noted the insurer could have easily eliminated the ambiguity by drafting the policy more precisely.  Id.  Here, the policy language clearly states "all material duties," where "all" has been interpreted as meaning "every."  See Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 270 (5th Cir. 2005).  Thus, Gardner's interpretation is unpersuasive.  Gardner must prove that she is incapable of fulfilling all the material duties of any occupation.

14.  Gardner argues that determining the extent of disability requires consideration of two kinds of evidence: evidence of her medical condition or degree of impairment and vocational evidence as to the existence of viable jobs, with due consideration given to her qualifications (or potential qualifications) and impairment.  McKenzie, 41 F.3d at 1316–17 (quoting the standard used in Jenkinson v. Chevron Corp., 634 F. Supp. 375, 379 (N.D. Cal. 1986) (Lynch, J.)).

1  However, <u>McKenzie</u> disapproved <u>Jenkinson</u> and concluded that :

2          consideration of vocational evidence is unnecessary where the evidence
   in the administrative record supports the conclusion that the claimant
3  does not have an impairment which would prevent [her] from performing
   some identifiable job . . . [to find that plaintiff is not totally disabled]
4  requires only that [plaintiff] be able to perform a job for which [she] is
   qualified or for which [she] can reasonably become qualified by training,
5  education or experience.

6  McKenzie, 41 F.3d at 1317.

7

8  III.    SUMMARY OF MEDICAL AND VOCATIONAL EVALUATIONS

9

10 1. On August 9, 2004 Dr. Young diagnosed plaintiff with median, radial and ulnar neuritis in both

11 forearms; myofascial pain in both forearms, flexor tendinitis, bilateral thoracic outlet syndrome, and

12 double crush syndrome.  AR 204.  He concluded that she could stand and walk without any

13 difficulty, but repetitive use of her hands was very limited and she could not do any repetitive work

14 with her hands.  AR 219, 816.  He stated these restrictions were permanent.  AR 219.  As of March 7,

15 2002 he believed she could work, as long as she did not use her upper extremities.  AR 816.  The

16 court has no reason to doubt these conclusions.  The court does, however, take issue with the

17 November 2001 note indicating Gardner was "currently" working as a supervisor for her employer.

18 The record makes clear that Gardner's final day of work was in August and that she desired to be a

19 supervisor but her employer was unable to accommodate her request.  AR 909, 923.  No evidence in

20 the record confirms that she ever acted as a supervisor for Bear Creek.  The court concludes Dr.

21 Young must have been mistaken.

22

23 2. On July 31, 2003 Dr. Morningstar diagnosed Gardner with reoccurring bilateral carpal tunnel

24 syndrome.  He believed she needed to greatly reduce or cease working.  AR 221.  He classified her

25 as Class 4, meaning she had a "moderate limitation of functional capacity; capable of

26 clerical/administrative ('sedentary') activity."  AR 223.  He believed that Gardner was "unable to do

27 any work that involved repetitive use of her hands."  AR 225–26.  On November 12, 2006 he stated

28

UNITED STATES DISTRICT COURT
For the Northern District of California

22

UNITED STATES DISTRICT COURT
For the Northern District of California

she was "significantly and chronically disabled" and could not use her hands for repetitive work. AR 225 –26. He determined she could stand and walk without limitation, she could sit frequently, do simple grasping occasionally and was precluded from reaching, firm grasping, carrying or pushing objects. AR 229–30.

3. Dr. Nelson diagnosed plaintiff with Thoracic Outlet Syndrome. AR 235. He recommended she begin the Edgelow technique and opined that, while she was unable to perform sedentary work as of March 15, 2005, she could likely return to sedentary work, albeit in a modified form, in 3–4 months after the Edgelow technique reduced her symptoms. AR 48, 235–36, 241. In his final Physical Ability Assessment, he found Gardner could stand and walk "continuously," sit "occasionally," and was completely precluded from reaching, simple grasping, firm grasping, fine manipulation, lifting objects, or carrying objects. AR 240–43. In April 5, 2005 he told Dr. Manolakas that Gardner could return to work in roughly four months. AR 48. In his July 28, 2005 report, he recommended that Gardner start the Edgelow technique, lose weight, seek psychological counseling, and "return to some kind of work" where she could self-pace herself. AR 244–45.

4. On March 23, 2005 Dr. Mendius diagnosed Gardner with Thoracic Outlet Syndrome. On his APS, he wrote "100% disability" and extended a line throughout all the categories. AR 247–49. The court declines to accept his finding of Gardner's 100% disability, as it is contradicted by every prior medical evaluation and Gardner's own self-reporting indicating she has a modicum of functionality. However, the court will take into account Dr. Mendius' determination of the severity of the disability as applied to Gardner's inability to fulfill the material duties of any occupation.

5. On April 5 2005, Dr. Manolakas reviewed Gardner's medical record and spoke with Dr. Nelson about Gardner's condition. Dr. Manolakas determined that there was "insufficient medical documentation" to determine whether Gardner's supposed restrictions were medically supported. However, his proffered explanation does not withstand scrutiny. He claims there no documentation

UNITED STATES DISTRICT COURT
For the Northern District of California

1   regarding loss of reflexes, sensation or tenderness, despite the fact that every doctor she had seen up

2   to that point had noted either her pain, reduced grip strength, difficulty sitting, tingling in her hands,

3   positive Tinel's/Phalen's signs, or loss of sensation in her hands.  Similarly, Dr. Morningstar, Dr.

4   Newkirk and the Aaenson report specifically noted Gardner's tender hands and clavicles.  AR

5   225–26, 280, 286–87.

6

7   6. While there was no imaging studies taken at the time of Dr. Manolakas' report, a subsequent

8   imaging study ordered by Dr. Newkirk found symptoms indicative of TOS and severe edema.  AR

9   139–140   This court is similarly unconvinced that being able to walk for three hours, do yoga and

10  sporadically shop is a "high level of function" as applied to working any actual occupation.  See

11  Lamarco v. CIGNA Corp., No. C-99-0561, 2000 WL 1456949, at *8 (N.D. Cal. 2000) (Jenkins, J.)

12  (holding that being able to perform "sporadic tasks" does not mean someone is capable of

13  performing any occupation) (quoting Moore v. American United Life. Ins. Co., 150 Cal. App. 3d.

14  610, 626–27 (1984)).

15

16  7. Finally, in regard to her pain control methods as indicative of non-incapacitating pain, Gardner

17  has made efforts to reduce her pain.  She avoided strong narcotic pain medication because she has a

18  sensitive stomach.  AR 803.  She followed Dr. Nelson's medical advice and sought behavioral

19  methods of pain control from pain specialist Dr. Hadland, who also recommended she avoid narcotic

20  pain relievers.  AR 308.  She has taken 1600 mg of IbuProfen a day, Mobic, and Lidoderm patches

21  to help control her pain.  AR 258, 308, 261.  Thus, Dr. Manolakas' proffered reasons for disputing

22  Gardner's disability fails to persuade the court.

23

24  8. Dr. Bronshvag, after conducting a needle EMG test and a thoracic outlet maneuver, found

25  Gardner to be "normal" and able to perform full-time work as of May 20, 2005.  AR 178–79.  The

26  court finds Dr. Bronshvag's analysis unpersuasive.  First, his approach has been criticized by both

27  Dr. Nelson and Dr. Newkirk as resulting from a misdiagnosis of Gardner's TOS symptoms as

28

24

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

vascular instead of neurological.  AR 140, 244.  Second, his diagnosis is contradictory, as he states, on the one hand, that there is no gross evidence of neurovascular compromise such as thoracic outlet syndrome but then states that whether one calls Gardner's condition "postural strain with thoracic outlet syndrome" or something else is a "semantic question."  AR 178.  He also concedes Dr. Nelson's recommendation for Gardner to start the Edgelow technique would reduce her symptoms, furthering the inference that he agrees with Dr. Nelson's diagnosis that Gardner has TOS.  AR 178. Finally, Dr. Bronshvag's Physical Ability Assessment stands in marked contrast with the assessments of every preceding medical evaluator.  Compare AR 178–79, 181–82 (Dr. Bronshvag stating Gardner can return to full time work, do simple grasping with both hands "continuously," do fine manipulation with both hands, and grasp firmly with both hands "frequently") with AR 219, 816 (Dr. Young stating that Gardner cannot use her upper extremities, that her condition is permanent, and she has difficulty lifting, driving, manipulating, and grabbing); AR 229–30 (Dr. Morningstar stating she cannot reach or grasp firmly and cannot use her upper extremities for any repetitive work); AR 235, 240–41 (Dr. Nelson stating Gardner's work capacity is less than sedentary and her ability to reach, to do simple grasping, firm grasping, fine manipulation, lift objects, and carry objects was completely restricted); AR 247–49 (Dr. Mendius stating that she has a "100% disability"); AR 344 (Dr. Hadland stating that Gardner's ability to grasp, reach, and manipulate objects was severely restricted).  At least as applied to Gardner's ability to use her hands for any repetitive tasks, the court finds Dr. Bronshvag's diagnosis overwhelmed by the other medical evidence in the administrative record and thus unpersuasive.

9.  Dr. Hadland stated that Gardner likely suffered from nerve impingement in the thoracic outlet and myofascial pain syndrome.  He was able to reduce her pain 90% in her right arm and 60% in her left arm and provided her with sleeping techniques to consistently obtain eight hours of sleep per night.  AR 252–54.  This eliminated her "sleep deficit," which she had claimed prevented her from concentrating and working scheduled hours.  AR 252–54.  On August 14, 2005, Dr. Hadland concluded that it would likely take many months, perhaps up to two years, before Gardener could do

UNITED STATES DISTRICT COURT
For the Northern District of California

1   "work of any kind."  AR 341.  Dr. Hadland based this conclusion on his evaluation of Gardner's

2   MRI, EMG, and a physical examination. AR 341. According to Dr. Hadland, Gardner can walk, sit

3   and stand up to 2.5 hours.  AR 343.  He further reported that Gardner's reaching, fine manipulation,

4   simple and firm grasping were severely restricted.  AR 344.  The court has no reason to doubt Dr.

5   Hadland's conclusion.  He had seen her for an extended period of time and based his conclusion on

6   objective medical evidence.  His conclusion is consistent with Dr. Nelson, who stated it would take

7   several months before Gardner could work at a sedentary level.

8

9   10.  On August 31, 2005 Dr. Newkirk found Gardner's disability to be "permanent."  He disagreed

10  with Dr. Bronshvag's evaluation of her reaching abilities, stating that the MRI in the record proved

11  she was unable to reach.  Dr. Newkirk found that Gardner's sitting tolerance was limited to thirty

12  minutes consecutively and no more than 2 hours a work day; that she can stand still for thirty

13  minutes consecutively, and do fine motor activity for five consecutive minutes for no more than an

14  hour a day.  He found her walking unrestricted.  On March 6, 2006 Dr. Newkirk declared that

15  Gardner was precluded from any work at or above shoulder level and precluded from "any sustained

16  activity in front of the body with either or both arms."  AR 140–141.  Dr. Newkirk concludes that

17  Gardner has been completely disabled since she initially left work.  AR 142.  The court finds Dr.

18  Newkirk's refutation of Dr. Bronshvag's analysis to be persuasive, as Dr. Newkirk is supported by

19  both objective medical evidence and is consistent with Dr. Nelson's criticism of Dr. Bronshvag's

20  diagnosis.  Dr. Newkirk's conclusion that Gardner is unable to use her upper extremities for any

21  sustained activity is consistent with the diagnoses offered by Dr. Young, Dr. Morningstar, Dr.

22  Nelson, and Dr. Hadland.  His finding that Gardner was unable to work during the period in dispute

23  is consistent with the findings of Dr. Nelson, Dr. Hadland and Dr. Mendius.

24

25  11.  On April 11, 2006 Dr. Hall concluded that Gardner's medical history and self-reported daily

26  activities negated a status of no-work.  This conclusion is the entirety of his recorded analysis.

27

28

1    12.  LINA's April 12, 2002 Transferable Skills Analysis found Gardner had no transferable skills.

2    AR 462.  The court find no reason to dispute LINA's conclusion.  The record indicates Gardner's

3    education, disability, and work experience were taken into consideration.  AR 462.  LINA was

4    aware of Dr. Young's diagnosis and came to this conclusion after an interview with Gardner.  AR

5    462; 800.

6

7    13.  The January 21, 2005 Ey report found—based on Gardner's education and work history,

8    LINA's 2002 Transferable Skills Analysis and Dr. Morningstar's 2004 Attending Physician

9    Statement — that Gardner had no work capacity.  AR 292–93.  The court finds no reason to reject

10   this conclusion.

11

12   14. The January 23, 2006 Aanenson report found that Gardner performed below the sedentary level

13   and could not compete in an open labor market.  Contrary to LINA's assertions, the Aanenson report

14   did not rely solely on plaintiff's subjective diagnosis of her own symptoms; the 2006 evaluation

15   made use of objective testing to determine Gardner's functional capacity using approved vocational

16   methods.  AR 282–91.  Further, the Aaenson reports conclusion that Gardner's occupational

17   performance is less than sedentary is consistent with the findings of Dr. Nelson, Dr. Mendius, Dr.

18   Hadland, and Dr. Newkirk.  The court, however, disagrees with the Aaenson report's determination

19   that Gardner can walk only up to an hour at a time (with arms supported) and only up to three hours

20   intermittently throughout the day.  Dr. Young, Dr. Morningstar, and Dr. Newkirk all reported she

21   could walk without any limitation.  AR 219, 229–30, 140–41.  Similarly. Dr. Nelson reported that

22   Gardner could walk "continuously."  AR 240.  Dr. Bronshvag also noted that she could walk

23   continuously.  AR 181–82.  Further, Gardner's self-reports to LINA repeatedly stated that she

24   walked to relieve stress and pain.  AR 759.  Even in the Aanenson report, Gardner listed walking as

25   a daily exercise that brings her relief.  AR 285.

26

27   15.  The surveillance on Gardner's house failed to discover anything that supports she can work any

28

UNITED STATES DISTRICT COURT
For the Northern District of California

occupation.  Being monitored sitting for five individual minutes over the course of four days does not demonstrate work capacity or contradict the repeated testimony and diagnoses indicating her inability to sit for a sustained period of time.  The investigators failed to demonstrate that Gardner was able to do any sustained activity with her upper extremities.  Gardner never even left her house. The only information gleaned from Gardner's background check that the court finds pertinent is Gardner's online biography.  While it was written prior to her disability by uninvolved third parties, Gardner makes no attempt to refute its claims as to her professional experience in graphic design and developing small businesses.  Gardner also confirms she is able to attend school.

16.  At issue is Gardner's medical status on June 17, 2005—when LINA concluded that Gardner was not disabled—and LINA's denial of her appeal on April 12, 2006.

17.  Based on the conclusions set above, the court finds that Gardner has met her burden of proving that she was unable to work in any occupation.  Gardner's medical records and vocational assessments demonstrate her inability to physically work.  Aside from Dr. Bronshvag, every doctor attests to her inability to use her upper extremities for repetitive tasks. Dr. Morningstar called her "chronically disabled"; Dr. Nelson reported on March 15, 2005 that she could not perform sedentary work and on April 5, 2005 that it would be four months until Gardner could likely return to work, thus refuting LINA's June 17, 2005 decision to deny her Long-Term Disability Benefits.  Dr. Young stated she could only do "head or mind" work.  But a preliminary transferable skills analysis soon after Dr. Young's diagnosis found she had no transferable skills and the Ey report similarly concluded she had no work capacity.

The appeal evidence strengthens this finding.   In August 2005 Dr. Hadland specifically stated she was completely disabled and unable to work any occupation for up to one to two years. Dr. Newkirk, after reviewing her entire medical record, found that Gardner could not work any occupation.  The Aaenson report—the most comprehensive examination of her functional capacities—similarly concluded Gardner could not perform at a sedentary level and was unable to

compete in an open labor market based on her physical incapacities.

The court recognizes that Gardner has the burden of demonstrating that she cannot perform the material obligations of any occupation, which is a difficult burden of bear.  Gardner is assisted in her effort by the paucity of LINA's counter-evidence.  Dr. Bronshvag's diagnosis of Gardner's functional capacities remains estranged from every other doctor's diagnosis.  Dr. Manolakas' diagnosis selectively ignores much of the administrative record.  Dr. Hall's two-sentence analysis is an analytic nullity.  Gardner's self-reports and LINA's investigation into Gardner's functional capacity and experience similarly fail to convince the court that Gardner can work.  If it is any consolation to LINA, Gardner still has a continuing obligation, as per the terms of her insurance policy, to demonstrate that she is unable to enter the workforce.

For the aforementioned reasons, the court finds Gardner has satisfied her burden of proof.

## IV.    FIDUCIARY DUTY CLAIM

Plaintiff additionally brought a breach of fiduciary duty claim against LINA.  Both parties have agreed to the dismissal of this claim.  See Pl.'s Opp. at 2, n.1

## V.    EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD

Gardner has presented to the court various articles on thoracic outlet syndrome.  LINA argues that  the court should ignore these articles because they are outside the administrative record, they constitute inadmissible hearsay, and the record would become unwieldy if parties were allowed to submit articles on each issue.  On de novo review, a district court has the discretion to consider evidence that was not before the plan administrator but it should only consider this information "when circumstances clearly establish that additional evidence is necessary."  Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 943–44 (9th. Cir. 1995).  The court does not need to rely on the articles in reaching its conclusion.

## VI.    CLAIM HANDLING AND OFFSETS

UNITED STATES DISTRICT COURT
For the Northern District of California

1. Gardner discusses in detail defendant's administrative handling of her claim.  On de novo review, the court's only task is to evaluate whether the plan administrator correctly or incorrectly denied benefits.  Abatie v. Alata Health & Life Ins.Co., 458 F.3d 955, 963 (9th Cir. 2006).  Thus, LINA's administrative handling of Gardner's claim is irrelevant.

2. Gardner argues that LINA  incorrectly offset the workers' compensation benefits she received from the Social Security Administration.  AR 787.  The Policy specifically allows LINA to offset "any worker's compensation . . . including all permanent as well as temporary disability."  AR 480.  Thus, defendant acted properly in offsetting Gardner's  workers' compensation award.

3. Gardner argues that LINA  improperly offset her Social Security Disability Benefits.  One line of her attack is that because LINA "pressured" her to obtain a Social Security determination as to her ability to perform gainful employment, it cannot retain the benefits of that determination while claiming Gardner can work.  As stated, on de novo review the court's task is to make its own evaluation as to whether the plaintiff meets its burden.  Abatie, 458 F.3d at 963.  Further, there are critical differences between the occupational determinations made in Social Security Disability actions and ERISA actions.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832–33 (2003); see also Madden v. ITT Long Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1285 (9th Cir. 1990) (upholding a denial of long-term benefits under the "any occupation" standard even when social security disability benefits had been awarded).

4. LINA's policy allows it to offset "any disability  . . . benefits payable under the Federal Social Security Act . . . ."  AR 480.  The Policy further states that if the insured employee is covered by the Social Security Act for disability benefits (SSDI), the employee will be assumed to be receiving such benefits in an amount LINA estimates the employee is eligible to receive.  AR 481.  LINA cannot make this assumption if the employee provides proof she applied for and was denied SSDI benefits.  AR 481.  In August 2002, LINA reduced Gardner's benefits from $1,449.00 a month to

30

UNITED STATES DISTRICT COURT
For the Northern District of California

$925.70 a month, claiming she failed to provide proof she applied for SSDI benefits.  AR 762.  In a March 4, 2003 letter LINA advised Gardner that her monthly benefit would be further reduced to $50.00 based on an assumed receipt amount of $1,449.00 in SSDI benefits.  AR 743.  The letter also stated that once proof of Gardner's application was received, her long term disability benefits would be adjusted and her underpaid benefits would be refunded.  AR 743.  Up to this point, LINA acted properly, as Gardner had not provided LINA with proof that she applied for and was denied SSDI benefits.  On June 22, 2004 Gardner finally submitted a letter to LINA claiming that she had been approved for SSDI benefits.  AR 697.  The June 2004 letter informed LINA that Gardner had been approved for a SSDI monthly benefit award of $961.00 per month, retroactive to January 2001.  AR 697.   Gardner states in this letter that she is entitled to a back payment of $1459.60.  On June 29, 2004 LINA requested a copy of the actual SSDI award letter.  AR 696.  The parties do not cite to any further developments regarding the SSDI offsets.  Nowhere in her motion does Gardner present the court with an independent claim for  SSDI benefits from LINA or present an amount she believes is owed to her due to LINA's excessive offsets.  If Gardner presents this evidence solely to cast a poor light on LINA's business practices to garner sympathy, she is wasting both her and the court's time, as the court's duty upon de novo review is to determine whether she was properly denied long-term disability benefits.  If Gardner wants to make an actual claim for past benefits, she must submit to LINA her application for SSDI benefits, the official letter granting those benefits, the documentation on her retroactive award, and all applicable dates thereof.  In order to accomplish this, if Gardner intends to receive an adjustment, she must submit complete documentation within thirty (30) days of the date of this order.  LINA shall promptly make the calculations and determine the correct offset.

VII.    PREJUDGMENT INTEREST

        Gardner requests prejudgment interest of ten percent per annum pursuant to California. Insurance code section 10111.2.  However, this is an ERISA case and it is federal law that applies, not California law.  This Circuit has held that a district court has discretion to award prejudgment

31

**UNITED STATES DISTRICT COURT**
For the Northern District of California

interest when awarding ERISA benefits.  <u>Blankenship v. Liberty Life Assurance Co. of Boston</u>, 486 F.3d 620, 627 (9th Cir. 2007).  The interest rate prescribed under 28 U.S.C. section 1961 is the proper rate for prejudgment interest unless the district court finds, based on substantial evidence, that the equities of the case require a different rate.  <u>Id.</u> (quoting <u>Grosz-Salomon v. Paul Revere Life Ins. Co.</u>, 237 F.3d 1154, 1163–64 (9th Cir. 2001).  Interest shall be calculated from the date of the entry of the judgment, at a rate equal to the applicable weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System. 28 U.S.C. § 1961(a).  Gardner has not provided any evidence that her particular case requires a different rate.  Accordingly, section 1961 sets the proper rate for calculating prejudgment interest.

In view of the range of rates during the period of June 2005 to present, the court sets the prejudgment rate at 4.90%

CONCLUSION

IT IS THEREFORE ORDERED THAT plaintiff's claim for long term disability benefits be GRANTED, from the date of June 17, 2005, to the date of judgment, with prejudgment and post-judgment interest at the rate of 4.90% .  Social Security Disability offsets, if any, applied pursuant to this order shall be included in the calculations.  The parties shall submit a form of judgment in accordance with this order after all calculations have been made, but at least within sixty (60) days of the date of this order.

IT IS FURTHER ORDERED THAT plaintiff is entitled to benefits going forward, conditioned on the requirements of the Policy as interpreted by this order.

IT IS SO ORDERED.

Dated:   August 6, 2007

_____

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

ENDNOTES

1. All facts cited herein are taken from the Administrative Record ("AR") unless otherwise noted.

2. Dr. Hadland is a pain management specialist who Gardner began seeing on March 16, 2005.  His medical analysis has not yet been mentioned because he did not issue an APS until August 2005.

3. LINA objects to Dr. Hadland's classification as a pain management specialist and points to Dr. Hadland's letterhead that reads "Integrative Health Counseling", AR 341, as proof he is not a pain specialist; but Dr. Nelson characterizes Dr. Hadland as "a psychiatrist for counseling as well as behavior modification with respect to pain management." AR. 244.  There is no dispute that Dr. Hadland is a medical doctor with some expertise in pain management.